**Motion for Preliminary Injunction (expedited)**

1. I'm currently living at the SPU, in NH State Prison. My doctors refuse to treat my ADHD. I have been forced to request continuances b/c my brain fog precludes me representing myself effectively (see Exhibit A).

2. I have been living at the SPU over six months and they are apparently incapable of managing my medication so that I can function at any reasonable level. I have been consistently suicidal.

3. Attempts to escalate my complaints with NHSP administration have been unsuccessful.

4. It seems likely that, without intervention from this court I won't be able to resolve the issue as both forensic psychiatric & security staff seem generally indifferent to my constitutional rights.

**Relief:** Although both these cases are subject to a stay I am requesting the court use its equitable relief to address the issue immediately, as I clearly will be prejudiced without immediate action. Rule 62 of FRCP sets forth specific procedures governing stays, but those are not in derogation of inherent equity powers.

B. Specifically, Fed. R. Civ. P. 62(g) states that nothing in Rule 62 "limit[s] the power of an appellate court to ... grant an injunction, or (2) to issue an order to preserve the status quo."

C. I've therefore attempted to X-file this injunction in the 1st Circuit. It's not clear to me why an entire case would be stayed in order to litigate an extremely narrow(?) interlocutory appeal.

D. The magistrate judge may lift my stay at any time when she decides my case is ripe for preliminary review and I urge her to do so as I've already exhausted my remedies with respect to this specific(?) in state court.

E. Conditions of confinement claims which affect the length of one's confinement are properly addressed in a habeas petition according to the 1st Circuit in <u>Brennan v. Cunningham</u> 813 F.2d 1 (1987). Inability to represent myself in a pro se habeas petition in oral argument is definitely a significant impediment.

F. This isn't hypothetical, this is literally how I exhausted state remedies.

G. The balance of hardships favors me; I am likely to succeed on the merits as I've clearly proven an impingement on my 1st Amendment rights, which in turn demonstrates "irreparable harm".

H. There is literally no reason for the State not to medicate me besides that they don't care enough, and no one's successfully litigated an injunction forcing them to. 8th Amd. analysis perhaps inappropriate here.

I. Please grant any further relief you see just, including damages against the Commied Corrections in her personal capacity.

Mailed to D.N.H. e-filed with State, 5/ /22 by Lee Grace Woodham in pro per. Concord
(Sorry for horrible writing and heedless grammatical errors)

By Jennifer Kahn

July 20, 2021

To hear more audio stories from publications like The New York Times, download Audm for iPhone or Android.

On a cold December day in Norwich, England, Cathie Martin met me at a laboratory inside the John Innes Centre, where she works. A plant biologist, Martin has spent almost two decades studying tomatoes, and I had traveled to see her because of a particular one she created: a lustrous, dark purple variety that is unusually high in antioxidants, with twice the amount found in blueberries.

At 66, Martin has silver-white hair, a strong chin and sharp eyes that give her a slightly elfin look. Her office, a tiny cubby just off the lab, is so packed with binders and piles of paper that Martin has to stand when typing on her computer keyboard, which sits surrounded by a heap of papers like a rock that has sunk to the bottom of a snowdrift. "It's an absolute disaster," Martin said, looking around fondly. "I'm told that the security guards bring people round on the tour." On the desk, there's a drinks coaster with a picture of an attractive 1950s housewife that reads, "You say tomato, I say [expletive] you."

Martin has long been interested in how plants produce beneficial nutrients. The purple tomato is the first she designed to have more anthocyanin, a naturally occurring anti-inflammatory compound. "All higher plants have a mechanism for making anthocyanins," Martin explained when we met. "A tomato plant makes them as well, in the leaves. We just put in a switch that turns on anthocyanin production in the fruit." Martin noted that while there are other tomato varieties that look purple, they have anthocyanins only in the skin, so the health benefits are slight. "People say, Oh, there are purple tomatoes already," Martin said. "But they don't have these kind of levels."

The difference is significant. When cancer-prone mice were given Martin's purple tomatoes as part of their diet, they lived 30 percent longer than mice fed the same quantity of ordinary tomatoes; they were also less susceptible to inflammatory bowel disease. After the publication of Martin's first paper showing the anticancer benefit of her tomatoes, in the academic journal Nature Biotechnology in 2008, newspapers and television stations began calling. "The coverage!" she recalled. "Days and days and days and days of it! There was a lot of excitement." She considered making the tomato available in stores or offering it online as a juice. But because the plant contained a pair of genes from a snapdragon — that's what spurs the tomatoes to produce more anthocyanin — it would be classified as a genetically modified organism: a G.M.O.

That designation brings with it a host of obligations, not just in Britain but in the United States and many other countries. Martin had envisioned making the juice on a small scale, but just to go through the F.D.A. approval process would cost a million dollars. Adding U.S.D.A. approval could push that amount even higher. (Tomato juice is known as a "G.M. product" and is regulated by the F.D.A. Because a tomato has seeds that can germinate, it is regulated by both the F.D.A. and the U.S.D.A.) "I thought, This is ridiculous," Martin told me.

Martin eventually did put together the required documentation, but the process, and subsequent revisions, took almost six years. "Our 'business model' is that we have this tiny company which has no employees," Martin said with a laugh. "Of course, the F.D.A. is used to the bigger organizations" — global agricultural conglomerates like DowDuPont or Syngenta — "so this is where you get a bit of a problem.

Grace Woodham
SPU # 139265
218 N State St
Concord NH 03302



US District Court - NH
55 Pleasant St
Concord NH 03304

"Mailed from the NH State Prison. Contents have not been evaluated. Not Responsible for content/substance."